UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LELLI'S INN, INC.,                              Case No. 13-14766

           Plaintiff,                  John Corbett O'Meara
v.                                              United States District Judge

STEVEN LELLI'S INN ON THE GREEN,                Stephanie Dawkins Davis
L.L.C., *et al*,                                United States Magistrate Judge

           Defendants.
_____/

**REPORT AND RECOMMENDATION**
**PLAINTIFF'S REQUEST TO ENFORCE JUDGMENT AND FOR**
**SANCTIONS BASED ON BREACH OF TRADEMARK AGREEMENT**

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Lelli's Inn, Inc. is the owner of the upscale Italian Steakhouse

known as "Lelli's® Inn," which opened in 1939.  Lelli's Inn used the Lelli's®

designation as a trade name, service mark and trade mark.  The original restaurant

was located in Detroit, Wayne County, Michigan.  Plaintiff opened a second

location, also known as "Lelli's® Inn" in Auburn Hills, Oakland County,

Michigan in 1996.  Plaintiff obtained protection for the subject marks from the

United States Patent and Trademark Office in 2013.  In 2010, defendants opened a

restaurant called "Steven Lelli's Inn on the Green" in Farmington Hills, Oakland

County, Michigan.  Steven Lelli's Inn on the Green is also an upscale Italian

Steakhouse.  There are no common owners between Lelli's Inn and Steven Lelli's Inn on the Green.  However, Steven Lelli, who contracted with the owner of Steven Lelli's Inn on the Green for the use of his name for Farmington Hills restaurant, is the grandson of the Lelli's Inn founders, and son of its current owner, Michael Lelli.  (Dkt. 86, Zarkin Transcript, Pg ID 988; Dkt. 68-1, p. 1, Trademark Agreement; and Dkt. 82, Pg ID 766, Thibodeaux Transcript).

Lelli's Inn, Inc., initiated this action alleging that defendants, including Steven Lelli's Inn on the Green, L.L.C., infringed on its trademark and gave the false impression that the Farmington Hills restaurant is part of the same business as plaintiff.  The parties settled the case and memorialized the settlement terms in a "Trademark Agreement" ("TMA") which became effective November 1, 2014.  (Dkt. 68-1, TMA).  The TMA lists several restrictions regarding defendants' signage, decor, and advertising; for example, defendants, whose restaurant opened in 2010, are not permitted to represent that they have been in business since 1939, which is the date of plaintiff's founding.  The court entered the parties' stipulated order dismissing the case with prejudice on January 27, 2015.  (Dkt. 45).  The order provides that the court retains jurisdiction for the purpose of enforcing the parties' settlement agreement.  *Id*.

On May 1, 2015, plaintiff filed a motion to enforce judgment and for sanctions for violations of a settlement agreement, entitled Trademark Agreement.

2

(Dkt. 46, 47).  On January 19, 2016, District Judge John Corbett O'Meara denied

plaintiff's motion, making the following observations and concluding that plaintiff

had not met its burden of establishing entitlement to the relief sought:

> Plaintiff alleges that Defendants have violated the settlement agreement in various ways, including by holding themselves out to the public as having been in business "since 1939" and by using "Lelli's" or "Lelli's Inn" without also including "Steven" and "on the Green."  Plaintiff contends that it has discovered at least fifty violations of the settlement agreement, involving Defendants' menu, napkins, business cards, website, interior decor, and exterior signs. Plaintiff seeks $10,000 for each violation, or $500,000.  The settlement agreement provides for "the greater of" actual damages or $10,000 "for any material violation." Defendants disagree that they have engaged in "material" violations of the agreement and represent that they have corrected each alleged violation. Defendants dispute certain violations and/or whether Plaintiff has provided sufficient proof. Defendants further argue that the liquidated damages provision of the agreement is an unenforceable penalty clause.

> Based upon the record before the court, there are issues of fact as to both the number of alleged violations and as to whether the violations are "material," particularly in light of Defendants' contention that all the alleged violations have been corrected.  Because of these disputed issues, this matter does not lend itself to summary adjudication.

> Further, Plaintiff's request for $500,000, in light of the facts and circumstances of this case, may veer into penalty territory.  *See In re Exemplar Mfg. Co.*, 331 B.R. 704, 711-12 (Bankr. E.D. Mich. 2005) ("A liquidated damage clause is void if it provides for an amount of

> damages that is unreasonable in light of the possible
> injury suffered in the event of a breach.").  Plaintiff has
> not demonstrated that this amount is reasonable given
> the nature and duration of the alleged violations.

(Dkt. 67, Pg ID 606-07).  Plaintiff then moved for an evidentiary hearing on the matters that were the subject of its motion to enforce judgment and for sanctions. (Dkt. 68).  Judge O'Meara granted this motion and referred the evidentiary hearing to the undersigned for report and recommendation.  (Dkt. 72, 73).

The undersigned held an evidentiary hearing on April 28, 2016, September 14, 2016, and September 30, 2016.  (Dkt. 82, 86, 87).  Plaintiff submitted proposed findings of fact and conclusions of law on December 3, 2016 and defendants filed their proposed findings of fact and conclusions of law on December 4, 2016.  (Dkt. 89, 90).  On February 9, 2017, plaintiff filed a supplemental brief, without leave of Court, and defendants filed a response.  (Dkt 91, 92).  These briefs will be stricken via separate order.  This matter is now ready for report and recommendation.

## II.    ANALYSIS AND CONCLUSION

### A.    Legal Standards

According to the stipulated order of dismissal, the Court retains jurisdiction over any disputes arising from the settlement agreement.  (Dkt. 45).  Thus, this Court has jurisdiction over this dispute as set forth in *Kokkonen v. Guardian Life*

*Insurance Company of America*, 511 U.S. 375, 380-81 (1994).[1]

The Sixth Circuit holds that settlement agreements are contracts governed by principles of state contract law. *Neely v. Good Samaritan Hospital*, 345 Fed. Appx. 39, 43 (6th Cir. 2009); *MLW Associates, Inc. v. Certified Tool & Manufacturing Corp.*, 106 Fed. Appx. 307, 312 (6th Cir. 2004). Under Michigan law, a plaintiff first must establish the elements of a valid contract to state a claim for breach of contract. *Pawlak v. Redox Corp.*, 182 Mich.App. 758, 765, 453 (1990). The elements of a valid contract in Michigan are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Thomas v. Leja*, 187 Mich.App. 418 (1990). Once a valid contract has been established, the plaintiff then must prove (1) the terms of the contract, (2) breach of those terms by the defendant, and (3) injury to the plaintiff resulting from the breach. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003). "Under Michigan law, proof of damages is an essential element of a breach of contract claim." *Kevelighan v. Orlans Associates, P.C.*, 498

---

[1] In *Kokkonen*, the Supreme Court rejected the notion that ancillary jurisdiction could be applied to authorize the district court to take jurisdiction over the motion to enforce the settlement agreement, but recognizing jurisdiction over a settlement agreement may be exercised where the obligation of the parties to comply with the settlement agreement had been made part of the order of dismissal either by: (1) a separate provision in the dismissal order retaining jurisdiction in the district court over the settlement agreement; or (2) incorporating the terms of the settlement agreement into the order of dismissal. In that event, a breach of the settlement agreement would constitute a violation of the district court's order, and there would exist ancillary jurisdiction to enforce the settlement agreement. *See Perkins v. Booker*, 2011 WL 3664689, at *3 (W.D. Mich. Aug. 19, 2011).

Fed.Appx. 469, 476 (6th Cir. 2012) (internal citations omitted).  When interpreting a contract, "Michigan courts 'examine contractual language and give the words their plain and ordinary meanings.'"  *Ordos City Hawtai Autobody Co.*, *Ltd. v. Dimond Rigging Co., LLC*, 2017 WL 2471246, at *6 (6th Cir. June 8, 2017) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 544 (6th Cir. 2007) (alterations omitted) (quoting *Coates v. Bastian Bros., Inc.*, 276 Mich. App. 498 (2007)).  "If the language of the contract is unambiguous, the court construes and enforces the contract as written."  *Id.* (alterations omitted) (quoting *Quality Prod. & Concepts Co. v. Nagel Precision*, *Inc.*, 469 Mich. 362 (2003)).

B.    Findings of Fact

Paragraph 3 of the TMA sets forth the parties' agreement as to what defendant may not do relating to plaintiff's trademark:

> i.    Use the "Lelli's"® mark in lettering that is more than thirty-five (35) percent larger in font size than any of the other words within the Subject Restaurant's name (i.e., "Steven," "Inn," "on," "the," or "Green").
>
> ii.    Make any claim or statement (verbally, written, or electronic) that the Subject Restaurant is or has been an affiliation, extension or continuation of Plaintiff's Auburn Hills Restaurant, the Original Restaurant, or Plaintiff's Detroit predecessor restaurant.

6

     iii.    Make any claim or statement (verbally, written, or electronic) that the Subject Restaurant has been in business at any time before it opened to the public on November 12, 2010.

     iv.    Make any claim or statement (verbally, written, or electronic) that Steven J. Lelli worked with his grandfather.

(Dkt. 68-1).  Regarding violations of the above terms that existed on the date the agreement was signed, the parties agreed to several deadlines for retrofitting or updating in accordance with the parties' agreement.  There are two primary categories of existing violations: (1) those requiring cessation on the date of the agreement (*i.e.* 11/01/14), and (2) those for which the parties assigned deadlines to accomplish updating or retrofitting.  (Dkt. 68-1, Pg ID 616-617).

The First Category (from which the second category is excluded), includes all representations (via advertisements, websites, signs, displays, and interior decor) that defendant's restaurant is "Detroit's Original Italian Chophouse Since 1939" and/or any of the limitations set forth in Paragraph 3(i)-(iv) above.  (Dkt. 68-1, Pg ID 616, ¶ 4(i)).  The Second Category of violations were subject to a number of different deadlines for various updates and modifications for then-existing violations and contains two subcategories: (1) offending language on any outdoor signs, marquees, and monuments must be "concealed" within 90 days of the TMA (*i.e.* 01/30/15), and modified or removed within 12 months of the TMA

7

(*i.e.* 11/01/15), *see id.* at ¶ 4(ii)(a-b) ("Subcategory 1"); (2) offending language on the menus must be "concealed" within 60 days of the TMA (*i.e.* 12/31/14) and removed or modified within 6 months (*i.e.* 06/01/15) and offending language in the "interior decor" must be "concealed" within 90 days (*i.e. 0*1/30/15) and removed or modified within 12 months (*i.e.* 11/01/15) ("Subcategory 2").  This paragraph also provides that defendants are not required to remove any "photographs, wall art, or memorabilia on public display within the Subject Restaurant" as of the date of the TMA.  *Id.* at ¶ 4(iv).

In its proposed findings of fact and conclusions of law, plaintiff asserted violations of the TMA by listing a number of violations for each of subparagraphs in Paragraph 3.  In the view of the undersigned, this causes undue confusion and wrongful duplication of potential violations.  In presenting its claims in this manner, plaintiff inappropriately separates the provisions regarding deadlines (Paragraph 4) from the provisions explaining the scope of the TMA (Paragraph 3). In hopes of enhancing clarity, the Court will address the claimed violations of each Category and Subcategory identified above, in turn.

In their proposed findings of fact and conclusions of law, defendants spend much time explaining that they "tried" to satisfy the term of the contract, but were unable to do so in a timely fashion for a variety of reasons.  However, nothing in the TMA suggests that merely attempting to satisfy its terms excuses a failure to

comply with contract provisions, and defendants cite no legal authority for such a proposition.  Thus, to the extent defendants contend that their timely performance should be excused because they tried to comply, such a defense to the factual existence of any TMA violations is rejected.[2]  Each claimed violation of the TMA will be addressed individually below.

### 1.   Outdoor Signs, Marquees, and Monuments (Four Violations Found).

First, the Court will address the offending language on outdoor signs, marquees, and monuments (Subcategory 1 of Category 2).  Plaintiff claims nine separate violations of this provision:

1.   Two violations for the restaurant exterior (plaintiff's Ex. Tab G)[3]

2.   Two violations for restaurant exterior (plaintiff's Ex. Tab R)[4]

---

[2] Defendants do not argue that their liability should be extinguished by the doctrine of impossibility.  The doctrine of impossibility may extinguish a party's liability under a contract if performance of the party's promise becomes objectively impossible.  *Roberts v. Farmers Ins. Exch.*, 275 Mich.App 58, 73 (2007).  Courts have classified impossibility into two categories: original and supervening.  *Rogers, Plaza, Inc. v. SS Kresge Co.*, 32 Mich.App 724, 743 (1971). Original impossibility exists when performance is promised that was impossible at the time of the contract's inception, whereas supervening impossibility develops sometime after the parties entered into their contractual agreement.  *Id*.  In either event, "absolute impossibility is not required," however, "there must be a showing of impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved."  *Roberts*, 275 Mich. App at 74.

[3] Plaintiff's Exhibit Tab G was admitted into evidence on 9/14/16.  (Dkt. 86, Pg ID 902).

[4] Plaintiff's Exhibit Tab R was admitted into evidence on 4/28/16.  (Dkt. 82, Pg ID 816-817).

3.      Two violations for restaurant exterior (plaintiff's Ex. Tab S)[5]

4.      Two violations for restaurant exterior (plaintiff's Ex. Tab X)[6]

5.      One violation for exterior signs (plaintiff's Ex. Tab H)[7]

6.      One violation for signage on golf cart.  (Plaintiff's Ex. Tab E)[8]

(Dkt. 90, Pg ID 1127, 1130-31, 1133-34).

(a).    Exterior Doors

Plaintiff's Ex. Tab G includes two photographs of exterior doors of

defendants' restaurant taken by Thomas Gentile on April 30, 2015.  (Dkt. 86, Pg

ID 897-900).  Mr. Gentile is personal friend of Michael Lelli, plaintiff's owner.

(Dkt. 86, Pg ID 889).  Plaintiff claims that these photographs show two violations

of the TMA in that the name "Lelli's" is used and that "Lelli's" is more than 35%

larger than the rest of the verbiage.  Plaintiff's Ex. Tab R is comprised of two

photos, one of which appears to be a picture of the some of the same signage,[9]

taken by Lauren Underwood on July 21, 2015.  (Dkt. 82, Pg ID 816).  Ms.

---

[5]  Plaintiff's Exhibit Tab S was admitted into evidence on 4/28/16.  (Dkt. 82, Pg ID 778).

[6]  Plaintiff's Exhibit Tab X was admitted into evidence on 9/14/16.  (Dkt. 86, Pg ID 907-908).

[7]  Plaintiff's Exhibit Tab H was admitted into evidence on 9/14/16.  (Dkt. 86, Pg ID 904).

[8]  Plaintiff's Exhibit Tab E was admitted into evidence on 9/14/16.  (Dkt. 86, Pg ID 892).

[9]  The second photo of plaintiff's Ex. Tab R, also taken by Ms. Dunn, depicts an interior rug with "Lelli's" emblazoned on it.  It is discussed *infra* in relation to the interior decor.

Underwood is an attorney who represented Michael Lelli, plaintiff's owner, in another legal matter.  (Dkt. 82, Pg ID 98).  Scott Clymer (one of defendants' employees) confirmed in his testimony that these are all pictures of the same signage.  (Dkt. 87, Pg ID 1071-72).  Additionally, Sharon Dunn (a personal friend of Rebecca Lelli Thibodeaux, plaintiff's manager) testified that she took another picture of the front door, found under plaintiff's Ex. Tab S, showing the same signage on July 22, 2015.  (Dkt. 82, Pg ID 777).  And, one of the five pictures taken by Mr. Gentile on June 3, 2015, appearing as part of plaintiff's Ex. Tab X, also appears to be the front door.  Notably however, Mr. Gentile was unable to say with certainty the particular thing depicted, instead surmising that it was "probably" a window sign.  (Dkt. 86, Pg ID 905-906).  Mr. Gentile's uncertainty undermines the probative value of this photo.  As a result, plaintiff has not shown that photo number one under plaintiff's Ex. Tab X depicts a sign separate and apart from those identified on the doors in plaintiff's Ex. Tabs G and R.  The TMA provision regarding the font size of "Lelli's" speaks only in terms of its size relative to the rest of the words in defendants' restaurant name (i.e., "Steven," "Inn," "on," "the," or "Green").[10]  The signage in question in plaintiff's Ex. Tabs

---

[10]  It is also not clear from the record whether the first photograph under Tab H is part of the same doors/entryway depicted in plaintiff's Ex. Tabs G, R, and S.  Mr. Gentile testified that he could not recall what the picture depicted.  (Dkt. 86, Pg ID 902).  And, Frances Seasons (an employee of defendants) testified that the picture depicted the glass above the main entry doors.  (Dkt. 86, Pg ID 973-74).  Page 4 of plaintiff's Ex. Tab X contains a similar photograph and Ms.

G, R, and X does not use "Lelli's" in conjunction with the rest of defendants' restaurant name.  However, the signage nevertheless violates the TMA because it uses the Lelli's mark.

Frances Seasons (defendants' employee) testified that offending language was removed from the front doorway glass of the restaurant sometime in the summer of 2015, as evidenced by the photograph she took, admitted as defendants' Ex. 10.  (Dkt. 86, Pg ID 955).  Thus, while there is evidence that this violation was corrected at some point in the summer of 2015, it does not excuse the defendants' noncompliance with the January 20, 2015 conceal deadline.  Ms. Seasons also took a photograph, admitted as defendants' Ex. 12, showing that "Lelli's" was concealed on the front door.  (Dkt. 86, Pg ID 957-58).  However, Ms. Seasons could not provide the date of this photograph – only that it was taken sometime before the summer of 2015, possibly the day before the other.  *Id*. Nothing in defendants' Ex. 12 or Ms. Seasons' testimony suggests that defendants met the 01/30/15 conceal deadline.  Plaintiff alleges only that these signs were not "concealed" by the 90 day deadline, but does not claim that defendants failed to meet the 12 month modify/remove deadline.  In the view of the undersigned, the

---

Seasons confirmed that it was "same class entrance over the main entrance to the...restaurant." (Dkt. 86, Pg ID 974).  Thus, it is not clear that these photographs depict signage separate and apart from that in plaintiff's Ex. Tabs G, R, and S and the Court will not consider these a separate violation of the TMA.

failure to conceal the offending language by 01/30/15 on the door constitutes **one violation of the TMA**.

(b).    Freestanding outdoor signs.

Four additional photographs, included as pages 2 and 3 of plaintiff's Ex. Tab H (taken 04/30/15), and pages 2 and 3 of plaintiff's Ex. Tab X[11] (taken 06/03/15) show two freestanding outdoor signs, containing offending language in the form of the old logo.  Specifically, the photos reveal "Lelli's" appearing more than 35% larger than the remaining lettering of the full name of the restaurant, as well as the misuse of plaintiff's mark of "Lelli's" or "Lelli's Inn."  (Dkt. 86, Pg ID 974-75).  While no one appears to have precisely testified that the photographs depict two separate freestanding signs, it is evident from the photographs themselves that there are two signs with the offending language.  (*See also*, Dkt. 86, Pg ID 952) (Ms. Seasons testifies that there are two street signs).  Similarly, no one testified to the precise dimensions of the letters to verify the improper ratio of the word "Lelli's" to the other words in the restaurant name.  However, the improper ratio may be inferred from the defendants' corrective actions taken to modify the signs, coupled with the visual evidence presented.  Indeed, defendants presented evidence in the form of photos taken by Ms. Seasons (defendants' Exs.

---

[11]  The last remaining photograph under plaintiff's Ex. Tab X is of the golf cart.  This will be addressed separately.

7 and 8), that defendants corrected the signs sometime in the summer of 2015. (Dkt. 86, Pg ID 952-53).   However, the summer 2015 correction of these violations does not excuse the failure to comply with the January 20, 2015 conceal deadline.  Plaintiff alleges only that these signs were not "concealed" by the 90 day deadline, not that defendants failed to meet the 12 month modify/remove deadline.  In the view of the undersigned, the failure to conceal the offending language on two outdoor signs, as evidenced by photos from 04/20/15 and 06/03/15, i.e. - well after the 01/30/15 conceal deadline, constitutes **two violations of the TMA**.

(c).    Golf Cart

Plaintiff claims one violation of the TMA for the offending language found on one of defendants' golf carts.  (Dkt. 90, Pg ID 1127; Plaintiff's Ex. Tabs E, X). Plaintiff suggests that this violation falls into Category 1, but the undersigned concludes that this is part of outdoor signage.  As concluded below, it does not really matter, because under either analysis, the offending language on the golf cart constitutes one violation of the TMA.

Mr. Gentile took the photograph of a golf cart at defendants' establishment on April 30, 2015, showing offending language in the form of the old logo, that being the word "Lelli's" appearing more than 35% larger than the remaining lettering in full name of the restaurant, a misuse of "Lelli's" or "Lelli's Inn," and

the language "Original Chophouse Since 1939."  (Plaintiff's Ex. Tab E; Dkt. 86, Pg ID 891).  One of the pictures taken by Mr. Gentile on June 3, 2015, at page 4 of plaintiff's Ex. Tab X is a photograph of the golf cart, with the original logo with the large offending "Lelli's" in two different spots.  (Dkt. 86, Pg ID 907; Plaintiff's Ex. Tab X).

Defendants countered with photographs of the golf cart taken by Michael Franklin on May 21, 2015, showing that the language "Detroit's Original Chophouse Since 1939" had been obscured or concealed.  (Dkt. 86, Pg ID 939; Defendants' Ex. 4).[12]  Mr. Franklin is a law clerk employed by defendants' law firm, Joelson Rosenberg.  (Dkt. 86, Pg ID 934).  Ms. Seasons also testified regarding defendants' Ex. 14, a photograph she took in the summer of 2015 which showed that the large "Lelli's" from the original logo had been removed.  (Dkt. 86, Pg ID 959-60; Defendants' Ex. 14).[13]  However, nothing in defendants' Ex. 4 or Ex. 14 or the testimony offered by Ms. Seasons or Mr. Franklin suggests that defendants met the 01/30/15 conceal deadline.  The defendants' corrective action along with the visual evidence presented sufficiently establish nonconforming nature of the logo.  Thus, in the view of the undersigned, the failure to conceal the offending language by 01/30/15 on the golf cart is **one violation of the TMA**.

---

[12] Defendants' Exhibit 4 was admitted into evidence on 9/14/16.  (Dkt. 86, Pg ID 940).

[13] Defendants' Exhibit 14 was admitted into evidence on 9/14/16.  (Dkt. 86, Pg ID 960).

## 2.      Menus and Interior Decor (Six Violations Found)

Next, the Court will address the offending language on the menus and within the interior decor of defendants' restaurant (Subcategory 2 of Category 2). Plaintiff claims 17 or 25 separate violations of this provision (TMA, ¶ 4(iii)):

1.      One violation for wall plaque (plaintiff's Ex. Tab F)[14]

2.      Eight or 16 violations for the menu (plaintiff's Ex. Tabs Y, N)[15]

3.      Four violations for napkins (plaintiff's Ex. Tabs G, S, Z)[16]

4.      Two violations for flooring (plaintiff's Ex. Tab R)

5.      Two violation for coat check (plaintiff's Ex. Tab S)

(Dkt. 90, Pg ID 1127, 1130-31, 1133-35).

### (a).    Wall Plaque

As to the wall plaque identified in plaintiff's Ex. Tab F, the Court finds that it falls within the exception to this category, which provides that defendants are not required to remove any "photographs, wall art, or memorabilia on public display within the Subject Restaurant" as of the date of the TMA.  (TMA ¶ 4(iv)). The plaque is part of a larger piece of wall art or memorabilia that is fully depicted in defendants' Ex. 1.  (Dkt. 86, Pg ID 895-96).  It has been hanging in defendants'

---

[14] Plaintiff's Exhibit Tab F was admitted into evidence on 9/14/16.  (Dkt. 86, Pg ID 896).

[15] Plaintiff's Exhibit Tab N was admitted into evidence on 4/28/16.  (Dkt. 82, Pg ID 815-16).  Plaintiff's Exhibit Tab Y was admitted into evidence on 9/14/16.  (Dkt. 86, Pg ID 910).

[16] Plaintiff's Exhibit Tab Z was admitted into evidence on 9/14/16.  (Dkt. 86, Pg ID 911).

establishment since the first year of business.  (Dkt. 86, Pg ID 961).  Thus, in the

Court's view, this falls within the exception and **does not violate the TMA**.

> (b).    Menus

Plaintiff claims either eight or 16 separate violations for offending language

on the menus: (1) four or eight violations for plaintiff's Ex. Tab Y; and (2) four or

eight violations for plaintiff's Ex. Tab N.  More specifically, plaintiff maintains

that the photographs of the menu taken on June 3, 2015 (plaintiff's Ex. Tab Y)

contain four or eight separate violations because of the placement of four different

categories offending language: "Detroit's Original Italian Chophouse Since 1939,"

the misuse of "Lelli's" or "Lelli's Inn", the font size discrepancy, and the

statement that Steven Lelli "worked with his grandfather."  Plaintiff makes the

same assertion with respect to the photographs of the menu taken on July 21,

2015.  (Plaintiff's Ex. Tab N).  As noted above, any offending language on the

menus was to be "concealed" within 60 days of the TMA (12/31/14) and removed

or modified within 6 months (6/1/15).  While plaintiff indicates that each violation

alleged runs afoul of both the "conceal" and the "remove/modify" provision, it is

not clear whether plaintiff asserts that each entry regarding the menu on its chart

of violations (Dkt. 90) constitutes one or two violations –  that is whether they are

seeking a total of eight or 16 violations for the menus.

In the view of the Court, while there is evidence of an effort to conceal

some but not all of the offending language, the failure to conceal all of the

offending language by December 31, 2014 is one violation and the failure to

modify the menu by the six month deadline is a second violation.  Plaintiff's

attempt to assert multiple violations in a single menu, and to assert that

photographs of the menu on different days constitute separate violations is not a

reasonable interpretation of the TMA.  Rather, the menu either complied with the

TMA by the applicable deadlines or it did not.  And, counting menu violations in

the manner suggested by plaintiff would mean that plaintiff is essentially entitled

to a "daily" running tally of violations.  Nothing in the TMA suggests that such an

interpretation is reasonable or appropriate.  Thus, the failure to conceal and the

failure to remove offending language from the menus by their respective deadlines

constitutes **two violations**.

> (c).    Napkins

Next, plaintiff claims four violations for language on the napkins.

(Plaintiff's Ex. Tabs G, S, and Z).  Again, while the photographs of the napkins

containing the offending language (the misuse of "Lelli's" and the font

discrepancy) were taken on various dates (4/30/15, 6/13/15, 7/22/15), just as with

the menus, the napkins either violate terms of the TMA or they do not.  Plainly,

the napkins are embroidered with the old logo that misuses the "Lelli's" mark and

includes the font size discrepancy.  As provided in the TMA, "interior decor" must

18

be "concealed" within 90 days (1/30/15) and removed or modified within 12

months (11/1/15).  Again, there is no running daily tally for violations of the TMA

and thus, despite photographs being taken on three different dates, the violations

are not similarly multiplied.  Thus, the napkins violated both the conceal deadline

and the modification deadline and constitute **two violations of the TMA**.

(d).   Flooring

Plaintiff next asserts two violations of the interior decor conceal and

remove/modify deadlines relating to the flooring in the entryway of defendants'

restaurant because it misused the "Lelli's" mark.  (Plaintiff's Ex. Tab R, photo

taken 7/21/15 by Ms. Underwood; Dkt. 82, Pg ID 816).  Defendants offered Ms.

Seasons' testimony that she took the photograph depicted in defendants' Ex. 11,

which shows that the offending flooring had been removed.  (Dkt. 86, Pg ID 957).

However, Ms. Seasons was unable to specify when, beyond some time in the

summer of 2015, this photograph was taken.  (Dkt. 86, Pg ID 948).  Thus, while

there is evidence that the violation was corrected at some point in the summer of

2015, the later correction does not excuse the noncompliance with the January 20,

2015 conceal deadline.  Nevertheless, as detailed above, in the view of the Court,

plaintiff is not entitled to multiple violations of the TMA based on a single item

that fails to comply with deadlines in the TMA.  Here, plaintiff only alleges that

the flooring violated the "conceal" provision and does not contend that it violated

19

the "remove/modify" provision.  Thus, the undersigned concludes the failure to timely conceal the offending language on the flooring is **one violation**.

   (e). Coat check

  Finally, plaintiff contends that the coat check (plaintiff's Ex. Tab S, p. 1) contained offending language after the conceal deadline expired, but does not contend that defendants failed to meet the modify/remove deadline.  Ms. Seasons also testified for the defense that she photographed the coat check sometime in the summer of 2015, and her photograph (defendants' Ex. 15) showed that the large "Lelli's" mark had been removed.  (Dkt. 86, Pg ID 960-61).  Thus, while there is evidence that this violation was corrected at some point in the summer of 2015, that does not excuse the noncompliance with the January 30, 2015 conceal deadline.  Plaintiff contends that there are two violations regarding the coat check because it misused the "Lelli's" mark and because of the font size discrepancy. Again, plaintiff is not entitled to multiple violations of the TMA based on a single item that fails to comply with deadlines in the TMA.  Consequently, the undersigned concludes the failure to timely conceal the offending language by 1/30/15 on the coat check is **one violation**.

   **3.**  **All Other References (Category 1) (Eleven Violations Found)**

  Category 1 violations (from which the second category is excluded), include

all references (advertisements, websites, signs, displays, and interior decor) claiming that defendant's restaurant is "Detroit's Original Italian Chophouse Since 1939" or any of the limitations set forth in Paragraph 3(i)-(iv) above. (Dkt. 68-1, Pg ID 616, ¶ 4(i)). Violations of this provision that were in existence at the time the TMA was signed, were not granted any time for modification, removal, or updating. Rather, defendants were required to comply with this provision as of the date of the TMA, November 1, 2014. (Dkt. 68-1, Pg ID 616, ¶ 4).

(a).   Website

Plaintiff asserts seven violations of the TMA for offending content on defendants' website, post-dating the agreement. (Dkt. 90, Pg ID 1127, 1130, 1133; Plaintiff's Ex. Tabs D, T, U).[17]  Under plaintiff's Ex. Tab D are screen shots of defendants' website taken by Ms. Thibodeaux, plaintiff's General Manager, on April 23, 2015. (Dkt. 82, Pg ID 747-48). Under plaintiff's Ex. Tab T are screen shots of defendants' website taken by Jessica Kalvenas on July 21, 2015. (Dkt. 82, Pg ID 801-03). Ms. Kalvenas is a paralegal employed by plaintiff's law firm, Alspector, Sosin & Noveck, PLLC. (Dkt. 82, Pg ID 799-800). Under plaintiff's Ex. Tab U are screen shots taken by Ms. Kalvenas of defendants' website on August 11, 2015. (Dkt. 82, Pg ID 803-04). There is no dispute that the screen shots of defendants' website taken on all three dates contain offending language in

---

[17] Plaintiff's Exhibit Tab D was admitted at the 4/28/16 hearing. (Dkt. 82, Pg ID 748).

violation of various aspects of the TMA, including the old logo, which misuses the

"Lelli's" mark, the font size discrepancy, and language suggesting defendants

restaurant has been open "since 1939."  (*See* Plaintiff's Ex. Tabs D, T, and U).

Defendants' employee, Lawrence Mfytiu testified regarding his efforts to

modify the website to make it conform with the terms of the TMA.  (Dkt. 87, Pg

ID 1086-1104).  Mr. Mfytiu explained that the website was attacked by a virus

several times, forcing him to "roll back" the website to earlier versions, which

would make the offending language reappear on the website.  *Id*. at Pg ID 1087.

Mr. Mfytiu testified that he first tried to change the website to remove the

offending language possibly in May 2015, but he could not recall the precise date

or whether he tried to update it before or after the Easter menu appeared in the

screen shots taken on April 23, 2015.  *Id*. at Pg ID 1093, 1096.  Defendants argue

that plaintiff lacks "proof" that Mark Zarkin (defendant and owner of defendants'

restaurant) or anyone "in charge" of the restaurant had "control" over what was

posted on the website.  (Dkt. 89, Pg ID 1112, citing Dkt. 82, Pg ID 765).  Yet, it is

clear from Mr. Mfytiu's testimony that not only did defendants' control the

website, they were actively trying to update it so that it complied with the TMA,

albeit in an untimely fashion (that is, beyond the date of the TMA was effective).

The undersigned does not find Mr. Mfytiu's testimony regarding the virus attacks

to be persuasive; not because the claim is unbelievable, but because it simply does

22

not excuse the breach.  Again, defendants have not cited any authority for the

proposition that because performance was purportedly beyond their control, their

conduct somehow does not qualify as a breach of the TMA.

Unlike with violations of the TMA that required compliance by a certain

deadline, each time offending language is placed on the website, a violation of the

TMA has occurred.  While the undersigned still believes that the TMA does not

necessarily allow for a daily tally of violations, the three exhibits here show

entirely new and different content, each of which violates the terms of the TMA.

Yet, the website either complied with the TMA on a particular date or it did not

and thus, the undersigned will not count separately each alleged violation that

appeared on a given date.  Thus, the undersigned finds **three violations of the**

**TMA** occurring on 04/23/15, 07/21/15, and 08/11/15.

(b).    Facebook

Plaintiff alleges three violations of the TMA based on offending language

found on a Facebook page that purportedly belongs to defendants.  (Dkt. 90, Pg ID

1127, 1130, 1133; Plaintiff's Ex. Tab P).[18]  Ms. Kalvenas testified that she took

the Facebook screen shots on July 23, 2015.  (Dkt. 82, Pg ID 804).  There is no

question that images on the Facebook page in question violate the TMA in that the

page name is "Lelli's Inn on the Green" as opposed to "Steven Lelli's Inn on the

_____

[18] Plaintiff's Ex. Tab P was admitted at the hearing on 4/28/16.  (Dkt. 82, Pg ID 805).

Green"; there are photos showing the old logo; and website link previews describe the restaurant as "Detroit's Original Italian Chophouse Since 1939" and use the "Lelli's" mark.  (Plaintiff's Ex. Tab P).

There is also no question that, at some point in time, defendants controlled the content of this Facebook page.  Ms. Seasons testified however, that the changes were timely made to the Facebook page now used by defendants.  (Dkt. 86, Pg ID 963-64).  She further explained that the Facebook page captured in the screen shots was made by another designer who they worked with in 2012, who maintained the administration password, and they were not able to remove that page from Facebook or otherwise edit it.  *Id*. at Pg ID 964.  She attempted to have Facebook remove the page but was unsuccessful.  *Id*.[19]

Unlike the website, defendants appear to have lost control over the content on this Facebook page in 2012.  Ms. Seasons' version of events is supported by the screen shots themselves, which reveal no updates since December 2012.  (Plaintiff's Ex. Tab P).  In light of the apparent inability to control or update the content on this Facebook page, the undersigned finds **no violation of the TMA in this regard**.

---

[19]  While Mr. Myftiu testified that Facebook had "automatically" created the page for defendants, that testimony is contrary to that provided by Ms. Seasons.  (Dkt. 87, Pg ID 1088). The undersigned credits Ms. Seasons testimony as consistent with the Court's common understanding of how Facebook works.  That is, it is apparent from the screenshots that the Facebook page was not merely a placeholder Facebook page, given that it contained posts made by an apparent owner of the page.

(c).   Business cards

Plaintiff claims two violations of the TMA based on the business cards.

(Dkt. 90, Pg ID 1127, 1134).  Lauren Underwood testified that she obtained a

business card at defendants' establishment on July 15, 2015.  (Dkt. 82, Pg ID 817;

Plaintiff's Ex. Tab O).  The copy of this business card admitted as plaintiff's Ex.

Tab O, reflects the old logo, with the misuse of the "Lelli's" mark and the font size

discrepancy.  *Id*.  Defendants presented evidence, defendants' Ex. 9, that the

business card was updated sometime in 2015, possibly in April.  (Dkt. 86, Pg ID

954).  Thus, while there is evidence that this violation was corrected at some point

in the spring or summer of 2015, that does excuse noncompliance with the

requirement of cessation by the effective date of the agreement, November 1,

2014.  Thus, the undersigned finds that the outdated business cards, which were

still in use on July 15, 2015, constitute **one violation of the TMA**.

(d).   Telephone calls

Plaintiff claims three violations of the TMA based on recordings of

telephone calls with staff at defendants' restaurant on May 12, 2015, May 26,

2015, and July 15, 2015.  (Dkt. 90, Pg ID 1129-30; Plaintiff's Ex. Tabs J, K, and

M).[20]  The May 15, 2015 conversation was record by Ms. Dunn.  (Plaintiff's Ex.

---

[20] The recordings were played at the hearing but paper transcripts were submitted to the
Court after the hearing by plaintiff's counsel, Mr. Sosin.  The recordings were admitted into the
record on 4/28/16.  (Dkt. 82, Pg ID 754, 784-85).

Tab J).  Plaintiff's Exhibit Tab K consists of two separate conversations recorded by Ms. Thibodeaux on May 26, 2015, although plaintiff appears to be claiming only one violation.  (Dkt. 90, Pg ID 1129).  Plaintiff's Exhibit Tab M contains a conversation recorded by Ms. Dunn on July 15, 2015.  (Plaintiff's Ex. Tab M).  According to plaintiff, the May 12, 2015 conversation violated the TMA by identifying defendants' restaurant as the "Farmington Hills location" of plaintiff's restaurant.  Plaintiff also asserts that the May 26, 2015 conversation shows that defendants were inappropriately affiliating themselves with plaintiff by saying the restaurant was owned by "the same family."  Finally, with respect to the July 15, 2015 conversation, plaintiff asserts that defendants violated the TMA by representing that their restaurant was the "same Lelli's that was down in Detroit" and "in Auburn Hills."  (Dkt. 90, Pg ID 1129-30; Plaintiff's Ex. Tabs J, K, and M).

In accordance with TMA, defendants are permitted to represent to the public that "Steven J. Lelli is a member of the Lelli family and the grandson of the founders of the Original Restaurant," that "Steven J. Lelli previously worked for Plaintiff at the Auburn Hills Restaurant" and that the "Subject Restaurant uses several of the same or similar traditional Italian family recipes and services developed by the founders of the Original Restaurant."  (Dkt. 68-1, Pg ID 617, ¶ 5).  These terms present exceptions to defendants' obligations under Paragraph 3 of the TMA.

Defendants maintain that nothing stated in the subject conversations was misleading or untrue, citing Ms. Thibodeaux's testimony that Steven Lelli was, in fact, in the "same family" as the Auburn Hills restaurant.  (Dkt. 82, Pg ID 769-70). Defendants also point out that Mr. Zarkin instructed his staff on how to answer the phone but that he was not personally able to ensure that each staff member did so correctly.  (Dkt. 86, Pg ID 112).  Defendants also point to testimony of Mr. Clymer, who indicated that staff members were provided "a new script to go by when answering the phones that we were not any affiliation [sic] with the Lelli's downtown or in Auburn Hills."  (Dkt. 87, Pg ID 1062).

As with other violations, defendants' attempts or efforts to comply with the TMA do not excuse the existence of any breach.  In the view of the undersigned, the conversation on May 12, 2015 violated the terms of the TMA because the staff person represented that defendants' restaurant was the same as the one in Auburn Hills.  (Plaintiff's Ex. Tab J).

The conversations reflected in Tab K merely state that the defendants' restaurant is in the "same family."  In the view of the Court, this is not a clear violation of the TMA and falls within the exception found in Paragraph 5 of the TMA.  Considering the plain and ordinary meaning of the words used in Paragraph 5 and its subparts, the Court does not view the provision as permitting only those precise words to be spoken as they are written.  Rather, the Court must

assess whether the  words used appear to convey a message beyond what is permitted under the TMA's mandates or falls within the scope of the exception. As to Tab K, the undersigned concludes that the overall impression given in that conversation was merely that defendants' restaurant was owned by the same family, not that it was associated with plaintiff's establishments.

As to the July 15, 2015 conversation found under Tab M, the undersigned finds a violation of the TMA.  In that conversation, defendants' employee agreed that it was the same restaurant as the Lelli's in Detroit and Auburn Hills. (Plaintiff's Ex. Tab M).  In summary, the undersigned finds **two violations of the TMA** in the recorded conversations.

(e).    *Jewish News* ads

Plaintiff claims eight violations of the TMA based on the ads defendants placed in the *Jewish News*.  (Dkt. 90, Pg ID 1130, 1133; Plaintiff's Ex. Tabs B, C, I, L, and V).[21]  There is no dispute that all of the *Jewish News* ads contain offending language in violation of various aspects of the TMA, including the old logo, which misuses the "Lelli's" mark and has the font size discrepancy.  Each ad contains unique content.   In response, defendants again argue that they tried to comply with the TMA by telling staffers at the *Jewish News* that the ads had to be

---

[21] Plaintiff's Exhibit Tabs B, C, I, L, and V were admitted at that 4/28/16 hearing.  (Dkt. 82, Pg ID 30).

changed, but Mr. Zarkin maintains that he tried, but they simply continued to run the old ads.  (Dkt. 86, Pg ID 989-90).  He also said that sometimes they just ran ads automatically and did not provide proofs.  *Id*. at Pg ID 990.  Mr. Zarkin testified that every time he became aware of an offending ad, he would call the *Jewish News* about it and complain.  *Id*. at 992.  Notably, defendants did not present evidence from anyone at the *Jewish News*, and did not present evidence beyond Mr. Zarkin's testimony showing that any such requests were ever made.

The undersigned is not convinced that Mr. Zarkin's attempts to get the *Jewish News* to update the ads his business was paying for and which contained offending language, were sufficient to overcome the obvious breach of the TMA presented by each ad.  Again, defendants have not cited any authority for the proposition that because performance was beyond their control (which, in this case, is quite doubtful), somehow their conduct did not breach the TMA. Defendants were paying for the ads and could have controlled their content or stopped running the ads.  As with the website, each ad either complied with the TMA or it did not and thus, the undersigned will not count separately each alleged violation that appeared on a given date.  Thus, the undersigned finds that each of the five ads in the Jewish News constitutes one violation of the TMA and thus, **there were five violations** of the TMA for the ads.

C.    Conclusions of Law

      1.    **Were the violations of the TMA outlined above material?**

Defendants maintain that none of the breaches of the TMA were material because performance was rendered in a reasonable time, citing *United States ex rel. Ken's Carpets Unlimited v. Interstate Landscaping Co.*, 1994 WL 481684 *6 (6th Cir. Sep. 6, 1994). Defendants say they made the changes required by the Trademark Agreement within a reasonable time and have maintained those changes as required by the TMA. Thus, defendants' breach, if any, was that some of the required changes were not effectuated until a few months after the deadlines stated in the TMA. According to defendants, these actions cannot constitute a "material violation" of the TMA.

Plaintiff maintains that the violations were all material breaches of the TMA, citing *Chesterfield Exchange, LLC v. Sportman's Warehouse, Inc.*, 572 F.Supp.2d 856, 868 (E.D. Mich. 2008), which holds that a violation or breach of an agreement is considered "material" if such violation/breach "substantially limits the non-breaching party from receiving the benefit of his bargain," or where the violation involves a failure to perform an essential item of a contract. According to plaintiff, defendants' continued false assertions that their restaurant has been in business "since 1939" and otherwise is affiliated with plaintiff's restaurant are precisely the misrepresentations defendants promised to discontinue. Thus,

plaintiff maintains that the violations deprived plaintiff of the "benefit of its bargain" and strike at the very essence of the TMA.

Defendants correctly point out that *Ken's Carpets* says that "[f]ailure to perform within the time limits stated in a contract is generally not a material breach if performance is rendered within a reasonable time." *Id.* at *6. However, *Ken's Carpets* also makes clear that "if the nature of the contract makes timely performance essential, or if the contract expressly provides that time is of the essence, then failure to perform on time is a material breach." *Id.* In this case, there are two main purposes of the TMA: (1) for defendants to correct all existing violations by the agreed upon deadlines – including on the date the agreement became effective; and (2) to set specific limits on defendants' future conduct. As explained in *Ken's Carpets*, materiality is a question to be determined by examining the circumstances of the particular case, *Conn Aire, Inc. v. J.C. Leasing*, 1990 WL 209580 at *6 (6th Cir. Dec. 19, 1990) (unpublished), and thus is normally a question for the trier of fact. *Id.* at *7 (citing 6 Samuel Williston, A Treatise on the Law of Contracts § 841 at 159 (3d ed. 1962)). In the view of the undersigned, the reasonable time for performance was the negotiated and agreed on deadlines set forth in the TMA, not some months later or some other arbitrary date selected by defendants. Moreover, under defendants' theory, they have no liability even for those violations that were to be corrected by the effective date of

the TMA or for violations to which deadlines do not apply (e.g. advertisements using offending language).  Essentially, such an interpretation of the TMA entirely deprives plaintiff of the benefit of its bargain.  Indeed, defendants' interpretation of the TMA allows them to breach the TMA with virtual impunity.

### 2.   Is the liquidated damages clause in the TMA enforceable?

Plaintiff maintains that the liquidated damages clause is enforceable as to any material violation of the TMA.  First, plaintiff points out that defendants voluntarily agreed to the TMA and when they entered into the TMA, they were represented by two separate law firms both vastly experienced in intellectual property litigation.  Plaintiff points out that negotiations over the TMA lasted for several months and defendants never objected to the liquidated damages provision. Plaintiff asserts that defendants should be estopped from claiming the unenforceability of such clause.  And, according to plaintiff, all parties understood that the liquidated damages clause was the *quid pro quo* for defendants' insistence that the settlement terms not be included within an injunctive order.  Plaintiff maintains that defendants recognized that, without the weight of an injunction compelling defendants' compliance with the settlement terms, a liquidated damages provision would be needed in its place.  Plaintiff contends that if the parties' liquidated damages section were not enforced, defendants would be free to

violate the TMA with virtual immunity.[22]

Plaintiff also asserts that the Michigan Supreme Court has made plain that liquidated damage provisions are perfectly acceptable in Michigan.

> When it is difficult to determine the actual damages which would be suffered under such circumstances and where the determination of the actual damages for a breach are uncertain in their nature, difficult to ascertain or impossible to estimate with certainty by any pecuniary standard, the courts permit the parties to ascertain the damages for themselves and to provide in the contract the amount of damages which will be paid for the breach.

*Genesee Co. Bd. of Rd. Comm'rs v. North American Dev. Co.*, 369 Mich. 229, 236 (1963); *see also St. Clair Medical, PC v. Borgiel*, 270 Mich. App. 260, 271 (2006) (The court enforced a $40,000 liquidated damages provision against a physician who left plaintiff medical practice holding that such "a provision is particularly appropriate 'where actual damages are uncertain and difficult to ascertain or are of a purely speculative nature.'").  Plaintiff also contends that it is well-established that it is difficult to ascertain damages in intellectual property cases such as this one and that, under such circumstances, liquidated damages clauses are typically enforced.  *See e.g*, *Bose v. Ejaz*, 732 F.3d 17, 25 (1st Cir. 2013); *XCO Int'l, Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1001 (7th Cir. 2004).  Plaintiff maintains that

---

[22]  The Court notes that the representations set forth by plaintiff in this paragraph (Dkt. 90, Pg ID 1142) are not supported by any record evidence and thus, will not be considered in any assessment of propriety of the liquidated damages clause.

33

defendants bear the burden, and have failed to show, that the clause is invalid.

*Bose*, at 25; *XCO*, at 1003.  Plaintiff argues that defendants herein have utterly

failed to demonstrate why the liquidated damages provision their own attorneys

proposed, and to which they voluntarily agreed, should not be enforced.

 Defendants, on the other hand, maintain that the liquidated damages clause

in the TMA constitutes a penalty.  Under Michigan law, "[a] liquidated damage

clause is void as a penalty if it provides for an amount of damages that is

unreasonable in light of the possible injury suffered in the event of a breach.  *In re*

*Exemplar Mfg. Co.*, 331 B.R. 704, 711-12 (Bankr. E.D. Mich. 2005) (citing

*Curran v. Williams*, 352 Mich. 278 (1958)).  The purpose in permitting a

stipulation of damages as compensation is to render certain and definite that which

appears to be uncertain and not easily proven.  *Curran*, 352 Mich. at 283.  Before

accepting and enforcing a liquidated damages provision, the Court must examine

the provision and determine whether the "figure is really in the nature of an

attempted computation of the actual damages likely to result, or whether it has the

effect of exacting a penalty from the contract breaker."  *Nichols v. Seaks*, 296

Mich. 154, 161 (1941).  According to defendants, ¶ 13 of the TMA is an

unenforceable penalty.

 In support, defendants point out that plaintiff admitted that it did not suffer

any actual damages.  And, even assuming, arguendo, that each alleged violation

was material and actually occurred, defendants maintain that plaintiff in fact

suffered no damage as a result. Thus, $10,000.00 is unreasonable because

plaintiff's actual injury suffered was zero. According to defendants, the fact that

plaintiff did not even attempt to prove its actual damages shows that the purpose

and effect of ¶ 13 of the TMA is to exact a penalty from defendants. To be

enforceable, the liquidated damages portion of a contract must be in an amount

that is a reasonable estimate of the actual damages and that the damages cannot be

predicted with accuracy at the time of formation. *Hertzberg v. Nunn Bush Shoe*

*Co. (In re Constr. Diversification, Inc.)*, 36 B.R. 434, 436 (E.D. Mich. 1983).

"[R]easonableness is a function, at least in part, of the accuracy with which such

stipulated damages approximate the actual damages incurred by the party seeking

enforcement of the liquidated damages provision." *Id*. According to defendants,

¶ 13 of the TMA fails as a valid liquidated damages provision because it contains

neither a recitation of plaintiff's potential, estimated, or expected damages, nor an

assertion that plaintiff's damages would be difficult to calculate.

A liquidated damages provision is an agreement by the parties that fixes the

amount of damages in case of a breach of contract, and is enforceable if the

amount is reasonable with relation to the possible injury suffered and not

unconscionable or excessive. *UAW-GM Human Resource Center v. KSL*

*Recreation Corp*, 228 Mich. App. 486, 508 (1998). A liquidated damages

provision is appropriate if the actual damages would be uncertain and difficult to ascertain, or would be purely speculative.  *St. Clair Medical*, *PC v. Borgiel*, 270 Mich. App. 260, 271 (2006).  Whether a liquidated damages clause is valid depends on conditions at the time the contract was signed, and not at the time of the breach.  *Solomon v. Dep't of State Highways and Transportation*, 131 Mich. App 479, 484 (1984).  Whether a liquidated damage provision is in fact unconscionable or an unenforceable penalty provision is a matter of law to be determined by the Court in light of all the circumstances.  *U.S. v. Swanson*, 618 F.Supp. 1231, 1243 (E.D. Mich. 1985) (citing *In re United Merchants & Mfrs., Inc.*, 674 F.2d 134, 141 (2d Cir. 1982) (New York law); *In re Construction Diversification, Inc*., 36 B.R. 434, 436 (1983) (applying Michigan law)).

Even when the parties have agreed to a certain sum as liquidated damages, the provision can be invalidated if it is, in fact, a penalty.  *Randall v. Douglass*, 321 Mich. 492, 496 (1948).  "'Where, by the terms of a contract, a sum is mentioned as "liquidated damages" for a nonperformance of several distinct stipulations of very different degrees of importance, and this sum is to be payable equally on a failure to perform the least, as to that to perform the most, important or whole of them together, it is in legal effect a penalty....'"  *Id*. (quoting *Decker v. Pierce*, 191 Mich. 64, 70 (1916)).  "[C]ourts are to sustain such provisions if the amount is 'reasonable with relation to the possible injury suffered' and not

'unconscionable or excessive.'" *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 228 Mich. App. 486, 508 (quoting *Moore v. St. Clair Co.*, 120 Mich. App. 335, 339 (1982)). "[A] court will award actual damages for a breach and ignore a clause for liquidated damages if the parties' agreement is clearly unjust and unconscionable." *Angelo Iafrate Const. Co. v. Dep't of Transp.*, 2007 WL 3088577, at *2 (Mich. App. Oct. 23, 2007). The Michigan Supreme Court has explained that this is done "only ... where it is obvious from the contract ... and the whole subject-matter, that the principle of compensation has been disregarded." 314 Mich. 568, 574-75 (1946) (quoting *Jaquith v. Hudson*, 5 Mich. 123, 133 (1858)); *see also Hemlock Semiconductor Corp. v. Deutsche Solar GmbH*, 2016 WL 3743130, at *19 (E.D. Mich. July 13, 2016).

As observed in *Hemlock*, when contesting a liquidated damages provision, the burden of establishing the unconscionability of the provision lies with the party challenging the provision. *Id.* (citing *Travelodge Hotels*, *Inc. v. Govan*, 155 Fed. Appx. 235, 237 (6th Cir. 2005) (applying Ohio law).[23] The *Hemlock* decision

---

[23] The *Hemlock* court utilized the holding *Travelodge* as a reasonable extension of Michigan law:

> Although the Sixth Circuit in *Travelodge* applied Ohio law, nothing in Michigan law is contrary and the Court adopts the assignment of burden as a reasonable extension of Michigan law. Indeed, many jurisdictions have adopted this assignment of burden. *See e.g.*, *In re Dow Corning Corp.*, 419 F.3d 543, 550 (6th Cir. 2005) (applying Texas law); *Days Inn Worldwide, Inc. v. Adrian Motel Co.*, *LLC*, No. 07-13523, 2009 WL 3199882, at *15 (E.D.

further concluded that the burden is on the party seeking to avoid the operation of

a contract provision it knowingly agreed to.  *Id*. at *20 (citing *Vanderbeek v.

Barefoot*, 226 Fed. Appx. 209, 213 (3d Cir. 2007) (Third Circuit applied a New

Jersey rule that deems liquidated damages clauses between sophisticated entities

presumptively reasonable.).  The *Hemlock* court noted that Michigan law

concerning liquidated damages provisions is relatively sparse, but found that the

rule adopted in *Vanderbeek* was sound.  Here, defendants merely claim that

because plaintiff did not prove, or attempt to prove, actual damages, the liquidated

damages provision <u>must</u> be a penalty.  As explained in *Nichols v. Seaks*, 296 Mich.

154, 161 (1941):

> Where damages are difficult of ascertainment, courts will
> respect the honest attempt of the parties themselves to
> compute as best they can the just compensation from loss
> of the bargain by breach. Before accepting as conclusive
> the convention of the parties, it must be examined, and
> the court must determine whether the predetermined
> figure is really in the nature of an attempted computation
> of the actual damages likely to result, or whether it has
> the effect of exacting a penalty from the contract breaker.

In the view of the undersigned, after this lawsuit was filed, the parties engaged in

extensive settlement negotiations, were represented by able counsel, and agreed to

the liquidated damages provision in the TMA.  Defendants have offered no

---

Mich. Sept. 30, 2009) (applying New Jersey law).

*Id*. at *19, n. 11.

evidence that the liquidated damages clause in the TMA is anything other than an "honest attempt" of the parties to compute just compensation.  Moreover, the initiating payment of $50,000, which defendants paid at the time the agreement was executed, reflects the assessment of the parties that offending conduct could reasonably be valued in the tens of thousands of dollars.

However, *Nichols v. Sparks* also observed that such a contractual provision may cross into penalty territory where it applies equally to

> several different stipulations of very difference degrees of importance, and by the terms of the stipulation would be payable equally on the failure to perform the least as of that to perform the most important, or the whole of them together, it is, in legal effect, but a penalty, and not stipulated damages; since it is evident that parties themselves could not have treated it as mere compensation for actual damages.

*Id*. at 162.  A similar observation was made in *XCO*, *supra*: "The element common to most liquidated damages clauses that get struck down as penalty clauses is that they specify the same damages regardless of the severity of the breach."  *Id*. at *1004.  The undersigned concludes that the treatment of a failure to meet the conceal deadlines as having the same value as a failure to meet the modify/remove deadlines operates as a penalty because a breach of the conceal deadline is plainly less severe.  However, the Court need not strike down the liquidated damages clause in its entirety.  Rather, as explained in *XCO*, the proper judicial remedy is to

reform the clause to limit it to those breaches for which the clause constituted a reasonable specification of damages.  *Id*. at 1005.  Thus, the Court concludes that, as to changes required to be made by the modify/remove deadlines (two violations) and as to changes required to be made by the effective date of the agreement or which were not tied to any deadlines (11 violations), plaintiff is entitled to liquidated damages at $10,000 per violation.  However, as to those violations of the TMA that only failed to meet the conceal deadlines (8 violations), they are not entitled to any liquidated damages as a result.  Thus, reviewing the material violations set forth above, there are a total of 13 violations of the TMA for which plaintiff is entitled to recover liquidated damages, for a total of $130,000 in damages.

### 3.    Is plaintiff entitled to recover attorney fees?

The TMA provides for the recovery of reasonable attorney fees and costs to the prevailing party for any material violation of the TMA as declared and determined by the Court.  (Dkt. 68-1, Pg ID 618, ¶ 13).  The parties dispute whether plaintiff is entitled to recover costs and attorney fees.  In the view of the undersigned, it is premature to assess whether plaintiff is a prevailing party unless and until the District Court determines, in a final manner, what, if any, damages plaintiff is entitled to recover.  At that point, the District Court can determine if plaintiff is a prevailing party.  Then, plaintiff will have to submit a Bill of Costs

and Fees and the District Court can then assess their reasonableness, if applicable.

## III.    RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Court find that defendants committed 13 material violations of the TMA and that defendants must pay to plaintiff $10,000 in liquidated damages for each of those material violations, for a total of $130,000 in damages.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and E.D. Mich. Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed.R.Civ.P. 72(b)(2); E.D. Mich. Local

Rule 72.1(d).  The response must specifically address each issue raised in the

objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc.  If the Court determines that any objections

are without merit, it may rule without awaiting the response.

Date: October 24, 2017                    s/Stephanie Dawkins Davis
                                          Stephanie Dawkins Davis
                                          United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on October 24, 2017, I electronically filed the foregoing paper
with the Clerk of the Court using the ECF system, which will send electronic
notification to all counsel of record.

                                          s/Tammy Hallwood
                                          Case Manager
                                          (810) 341-7887
                                          tammy_hallwood@mied.uscourts.gov